In re NORTH AMERICAN LIGHT & POWER CO. et al.

No. 9593.

United States Court of Appeals Third Circuit.

Argued May 20, 1948.
Decided Nov. 5, 1948.

Percival E. Jackson, of New York City
(Theodore N. Tarlau and Joseph J. Bryer,
both of New York City, on the brief), for
appellants.

Harry G. Slater, of Washington, D. C. (Roger S. Foster, Solicitor. Sidney H. Willner, Associate Solicitor, Aaron Levy, and Joseph Auerbach, Attorneys, Securities and Exchange Commission, all of Washington, D. C., on the brief), for S. E. C.

Gray Thoron, of New York City, for North American Co.

Before McLAUGHLIN and KALODNER, Circuit Judges, and MADDEN, District Judge.

KALODNER, Circuit Judge.

The question involved is whether the Securities and Exchange Commission, "Commission", and the District Court, erred in approving as fair and equitable, pursuant to the Public Utility Holding Company Act of 1935, as amended, 15 U.S.C.A. § 79k(e), a plan submitted by the North American Company, "North American", for the liquidation of its subsidiary North American Light & Power Company, "Light & Power", without making a specific determination of the merits of complex and controverted claims pressed by the appellants, a group of common stockholders in Light & Power.

We are here concerned with that part of what has been designated in the proceedings as "Plan I" which provides for the distribution of the assets of Light & Power among its security holders and for the settlement of all claims against North American. North American submitted this Plan in response to an order of the Commission dated December 30, 1941, directing the liquidation and dissolution of Light & Power pursuant to Section 11(b) (2) of the Act, 15 U.S.C.A. § 79k(b) (2). 10 S.E.C. 924 (1941). Under the Plan, North American offered the sum of $7.50 per share to Light & Power stockholders for their stock interest and in settlement of all claims, and North American was to receive the remaining assets of Light & Power.

The facts are as follows:

Between 1932 and 1940 North American had acquired in the open market, at substantially less than par, $9,608,000 of Light & Power debentures. As a result of re-demptions in 1940 and 1941 its holdings were reduced to the $5,623,500 principal amount presently outstanding. All the publicly-held debentures were retired in 1942 at principal plus accrued interest in partial compliance with the liquidation and dissolution order previously mentioned. 11 S.E.C. 820 (1942), aff'd sub nom. City National Bank & Trust Co. v. S. E. C., 7 Cir., 1943, 134 F.2d 65. North American's holdings however, were not retired, since the Commission had questioned whether the debentures and other senior securities of Light & Power acquired by North American should be treated on a parity with those held by the public or should be limited to cost or subordinated in view of the relationship between the two companies and the circumstances under which North American had acquired them. 10 S.E.C. 924, 932 (1941). Light & Power paid no interest on those debentures since July 1, 1942, and pursuant to orders of the Commission the accruing interest was segregated pending a final determination of the issues involved. 12 S.E.C. 621 (1942); 13 S.E.C. 518 (1943). As of January 1, 1947, the interest thus segregated amounted to $1,391,816, but upon application of Light & Power, joined by North American, the Commission permitted Light & Power to apply that fund towards the payments it was obligated to make to Illinois Power Company, "Illinois Power", a registered holding company subsidiary of Light & Power, under the terms of a negotiated settlement [1] incorporated into the first part of Plan I. Holding Company Act Release No. 7446 (1947).

North American owns 44% (84,925 shares) of Light & Power's $6 cumulative preferred stock, having acquired it in the open market between 1932 and 1940, either directly or through its subsidiaries, at an average price of $48.64 per share. The original sale of preferred to the public was completed prior to December 31, 1932, at an average price of $92 per share. The preferred stock is entitled to $100 per share on dissolution, whether voluntary or involuntary, plus all unpaid and accrued dividends. Light & Power has not paid

---

[1] For details of settlement see Holding Company Release No. 7375 (1947).

preferred stock dividends since 1932, and as of January 1, 1947, accumulated dividends in arrears amounted to $87 per share.

North American, finally, owns 85% (5-327,067 shares) of Light & Power's common stock. Acquisition of this stock began in 1926. In 1927, it held 42.5% of the stock then outstanding, an equal amount being held by the Insull interests, and 15% being held by the Studebaker interests. By 1931, North American had increased its holdings to 43.94%. In that year, North American and The Middle West Corporation, "Middle West", an Insull company, entered into an agreement with Light & Power pursuant to which the latter borrowed $10,000,000 from certain banks for which it issued five notes maturing annually over the next succeeding five years. The agreement further provided that Light & Power was to retire the loan as it matured by offering to its common stockholders, other than North American, additional common stock at approximately 75% of the market price. North American and Middle West agreed to take up the unsubscribed stock. In 1932, Middle West became bankrupt and performance of the agreement fell to North American. When the first three notes matured in 1932, 1933 and 1934, some sales were made to the public common stockholders of Light & Power, but the bulk of the stock, amounting to 1,939,332 shares, was purchased by North American.[2] In 1935 and 1936, North American refused to make further purchases, contending it was not obligated to do so. It did, however, advance $4,000,000 to Light & Power to meet the last two maturing notes and compelled it to give new notes for that amount. A derivative action brought by the preferred stockholders resulted in a

court order directing North American to return the notes and the interest received thereon and to purchase additional common stock. Murphy v. North American, D.C., 1938, 24 F.Supp. 471, modified and affirmed, 2 Cir., 1939, 106 F.2d 74. In compliance, North American acquired 2,000,000 shares at $1 per share and 666,667 shares at $3 per share, in accordance with the 1931 agreement. The Light & Power common stock acquired by North American and its wholly-owned subsidiary under this agreement totaled 4,620,370 shares at an aggregate cost of $9,971,924.

Light & Power's principal assets consist of common stock of four utility companies.[3] As of December 31, 1946, the total assets of Light & Power were found by the Commission to be worth from a low of $74,425,399 to a high of $81,789,285. After deducting the amount of Light & Power's senior securities, including those held by North American, and accrued interest and preferred stock arrearages, the value of the common stock equity was determined to range between $31,098,423 and $38,462,309, or $5 to $6 per share. On the basis of the foregoing findings, the Commission concluded that $5.50 represented the reasonable break-up value per share of Light & Power's common stock, if the debt and equity securities of Light & Power held by North American were accorded their apparent rank and priority without regard to any claims for subordination or other equitable limitations.

Having made its preliminary determination of the break-up value of the common stock of Light & Power, the Commission next turned its attention to the claims asserted and developed by two groups of security owners. These claims are sum-

[2] In 1932, it obtained 133,168 shares at $15 per share.

In 1933, it obtained 972,830 shares at $2 per share, and a subsidiary, Edison Securities Corp., acquired 14,371 at the same price.

In 1934, it obtained 833,334 shares at $2.40 per share.

[3] 462,478 shares of Illinois Power Co., or 48.4% of Illinois Power's total outstanding common stock. Included in this figure are 150,000 shares acquired in connection with the Illinois Power settlement. Light & Power also holds 17,-

278 shares of Illinois Power preferred stock and 13,278 dividend arrears certificates.

1,050,000 shares, or 100% of the common stock of The Kansas Power and Light Co.

355,250 shares, or 35% of the common stock of Northern Natural Gas Co. All of these shares have since been sold and the proceeds applied to the payment of the publicly-held preferred stock.

165,000 shares, or 100% of the common stock of Missouri Power & Light Co.

marized by the Commission as follows: (Holding Company Act Release No. 7514).

"I. A claim on behalf of Light & Power against North American for any sums Light & Power might have to pay in connection with the Illinois Power settlement, on the theory that any action by Light & Power was taken under North American's direction. Under this theory, the Dana Group is seeking to have North American, rather than Light & Power, bear any cost of the Illinois Power settlement. In the course of these proceedings this claim has become known as and is hereinafter referred to as the claim-over.

"II. A claim that North American's holdings in Light & Power should be subordinated to the public security holders of Light & Power or limited to cost. This is based on:

"(a) a charge of general mismanagement, which it is contended falls within the pattern of the Deep Rock case, and the fact that North American's original acquisition of an interest in Light & Power was allegedly in violation of the anti-trust laws under the doctrine of the Columbia Gas case;

"(b) the contention that certain North American purchases of Light & Power senior securities, made during the period 1935-1937 when North American was not registered as a holding company under the Act and made after registration in 1937 without Commission authorization, were in violation of Sections 4(a) (4) and 9(a) (2) and void under Section 26 [15 U.S.C.A. §§ 79d(a) (4), 79i(a) (2), 79z];

"(c) a contention that senior securities, other than those involved in the claim in subparagraph b, purchased by North American in the market between 1932 and 1940 at depressed prices cannot now be permitted to participate to the extent of their face amount;

"(d) the contention by the Dana Group that the funds that North American expended in purchasing the securities referred to in subparagraph c should have been invested in 1931 in Light & Power stock 'by the control interests in the form of venture capital' instead of requiring Light & Power to borrow from banks. It

is argued that North American's common stock holdings should be reduced by the difference between the number of shares it actually acquired since 1931 and the number of shares it would have acquired had North American invested the $10,000,000 in Light & Power common stock in 1931 at the then current prices.

"III. Supplemental claims asserted on behalf of Light & Power against North American for certain transactions which took place during the period 1926-1932, when North American and the Insull Group had an equal interest in Light & Power. * * *"

Although the Commission analyzed the various claims, presenting a rather full picture of their subject matter and the positions of the parties with regard thereto, it did not "endeavor to pass on the individual merits of each claim", nor did it "attempt to fix a precise dollar value for each claim." Instead, it likened its function in the case *sub judice* to that of a bankruptcy or reorganization court, stating:

"* * * we do not approach them as though they were in issue in a suit for damages; we weigh them as integral elements of the 'bundles of rights' of the respective claimants in order to determine whether the plan achieves a fair and equitable distribution. What we are basically concerned with here is the participation to be accorded each group of security holders in the enterprise, and the claims and defenses asserted are significant in measuring the extent, if any, to which such participation should depart from the norm of *pari-passu* treatment. So the fact that certain stockholders may not have acquired their securities prior to the time of the acts they complain of will not *ipso facto* preclude our examination of such acts."

The approach of the Commission is epitomized in the statement that:

"In determining the fairness of the participation to be accorded the public common stockholders in the light of whatever equitable limitations are found to exist with respect to North American's participation, we think the proper approach to be taken is that suggested by the Dana Group—that is, to look at the claims as an interrelated

whole and what equitable limitations should be imposed by reason of such claims, rather than to attempt to assay separately each claim and its related defenses."

The Commission further determined that fair and equitable treatment of the public common stockholders required that they receive in satisfaction of their interests "something substantially in excess of an amount representing a *pari-passu* valuation of their shares." However, it did not agree that a full application of the Deep Rock and Columbia Gas cases was warranted.[4] Nor did it agree that the record required that North American be completely barred in its capacity as an 85% common stockholder from participation in the profits which it would give up if it were restricted to cost on its senior securities and that all such profits should inure to the public common stockholders. It concluded that although the Plan's offer of $7.50 per share gave some recognition to the stockholders over and above the *pari-passu* valuation, it was insufficient to constitute fair and equitable treatment. Indeed, it felt that any plan failing to diminish North American's participation at least to the extent of any profit on its holdings of senior securities would not be fair and equitable. And it noted the calculations of a witness (Freeman) that if North American were limited to cost on its present holdings of Light & Power's debentures and preferred stock, the break-up value of Light & Power's common stock would be increased by $2.42 per share over the *pari-passu* valuation, some 42 cents more than that offered in the Plan. Accordingly, the Commission refused to approve the Plan as originally offered.

The Commission did not stop at this point, but went on to consider what it would deem fair and equitable under the circumstances. It determined that Illinois Power common stock had a range of value from $31 to $35 per share. Using the midpoint of that range, $33, it found that a distribution of 3/10 of a share would constitute a payment to Light & Power's public stockholders of the equivalent of approximately $10, or $4.50 in excess of the pari-passu break-up value of Light & Power's stock.

Restating its resolution that the relationship between North American and Light & Power during the period under review must be viewed as presenting a single, although complex, problem for solution, the Commission nevertheless, as an index of the benefits to the public common stockholders of Light & Power, estimated that the additional amount which they would thus receive exceeds the amount which would accrue if North American were limited to cost on its Light & Power senior securities, as adjusted to eliminate profits and interest heretofore received and after elimination of those senior securities which were acquired by North American without Commission approval during the period when it was not registered as a holding company under the Act. The Commission did not attempt to apportion the $4.50 to the various claims asserted, but observed that if an analysis were to be made, the $4.50 payment would constitute recognition of the most drastic treatment with respect to the senior securities of Light & Power held by North American as well as recognition of all other matters asserted. Moreover, it was of the opinion that retirement of Light & Power stock by distribution of Illinois Power common stock was a more equitable and feasible means of accomplishing the statutory objectives, first because it would reduce the amount of cash Light & Power would require for the retirement of its publicly-held stock, and second, to the extent that Light & Power public common stockholders were injured as a result of North American's dealings with Illinois Power, it afforded them an opportunity to share the benefits both of the Illinois Power settlement and of the substantial financial improvements resulting from the settlement and other changed circumstances.

The Commission stated that it would approve the Plan put forth by North American if it were amended to include an offer of 3/10 of a share of Illinois Power common stock. In addition, to protect Light

---

[4] Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307, 59 S.Ct. 543. 83 L.Ed. 669, and Columbia Gas & Electric Corp. v. United States, 6 Cir., 1945, 151 F.2d 461, certiorari denied 1946, 329 U.S. 737. 67 S.Ct. 48.

930

& Power's public common stockholders against market changes, the Commission suggested North American should include in the amended Plan an offer to repurchase the Illinois Power common stock at $7.50 for each 3/10 share, said offer to remain open for a period of twenty-one days after the distribution of the stock. Within the 10 days allotted, North American amended its Plan in accordance with the suggestions of the Commission as outlined above. Enforcement proceedings were delayed for a period of five days to allow reargument by interested parties on the submission of additional evidence. No objectors appeared until the Amended Plan was submitted to the District Court, at which time the present appellants made their appearance.

It is the contention of the appellants that the Commission, and *a fortiori* the District Court, could not approve the Amended Plan as fair and equitable to the public common stockholders of Light & Power in the absence of findings and conclusions as to (a) the value and extent of the assets; (b) the value and extent of the debt and senior security claims against such assets; and (c) the shares and relative rank of common stock entitled to participate in the remaining net assets.

In sum, it is apparent that the appellants are complaining because the Commission did not resolve the merits of the various claims. While tentatively asserting that the Amended Plan is unfair, their basic

position is that they cannot determine whether the distributive value of the common stock as finally found by the Commission is fair or unfair in the absence of a substantive disposition of the claims. Calling attention to the fact that the Plan, even as amended, is a unilateral offer by North American rather than the result of arm's length bargaining between adverse parties, they object to the manner of treatment of the claims by the Commission, more especially since they regard certain of the claims as claims of the stockholders in their own right and not as intercompany disputes.

It at once appears that this is not a headlong attack upon the fairness of the Plan, but a lateral attack upon the formula adopted by the Commission in reaching its decision. With this in mind, it is understandable that the appellants have not sought to show affirmatively that the result reached by the Commission is in fact unfair and inequitable. There is no argument here that the substantial evidence fails to support the Commission's decision.

We deem it necessary to state, at the outset, that it is not the obligation of the Commission, upon finding a plan unacceptable, to forthwith proceed, as suggested by the appellants, to accomplish the purposes of the Act by means of subsection (d) of Section 11. Subsection (e) [5] of Section 11 specifically refers to a plan which may be approved "as submitted or as modi-

[5] Section 11(e), 15 U.S.C.A. § 79k(e), provides:

"In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers, any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the provisions of subsection (b) and fair and equi-

table to the persons affected by such plan, the Commission shall make an order approving such plan; and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. If, upon any such application, the court, after notice and opportunity for hearing, shall approve such plan as fair and equitable and as appropriate to effectuate the provisions of section 11, the court as a court of equity may, to such extent as it deems necessary for the purpose of carrying out the terms and provisions of such plan, take exclusive jurisdiction and possession of the company or companies and the assets thereof, wherever located; and the court shall have jurisdiction to appoint a trustee, and the court may constitute and appoint the Commission as

**931**

fied". Assuming that the proffered plan can be rejected without more, there seems to be no basis, in reason or common sense, for refusing to entertain a modification designed to cure the defects discovered by the Commission. It is but another step, and a progressive one at that, for the Commission to state not only the rationale of its rejection of the initial plan, but also to suggest the amendments which in its opinion and discretion would be necessary to bring the plan across the line of acceptability. Such procedure commendably accelerates the business at hand, and that is a consideration not without importance in this type of case. If the plan as amended conforms to the statutory requirements, and opportunity be given interested parties to have their say, we can see no reason for postponing the period of convalescence by prolonging the surgical operation of severing the subsidiary from the parental body. Of particular propriety in this regard is the statement contained in Senate Report No. 621 (74th Cong., 1st Sess., on S. 2796, p. 33):

"Subsection (e) expressly authorizes a holding company subject to the approval of the Commission and the court to work out a plan of reorganization to make unnecessary the issuance of an involuntary order for its reorganization by the Commission, and the Commission and the court are authorized to approve any plan so worked out voluntarily by a holding company as the Commission and the court might order under their compulsory powers * * *."

See In re Standard Gas & Electric Co., 3 Cir., 1945, 151 F.2d 326, 329 certiorari denied 1946, 327 U.S. 796, 66 S.Ct. 820, 90 L.Ed. 1022, which notes that the final bill enlarged the Commission's available remedies.[6] It may be noted too, that the Commission did not require North American to comply with its suggestions, and had the latter desired to stand or fall upon the original Plan it could have done so.

The appellants do not dispute that the Commission may approve a negotiated settlement contained in a plan, but insist that absent arm's length bargaining it cannot find a unilateral offer to settle to be fair and equitable without an adjudication of the claims.

As previously noted, the Act specifically provides for management initiative in the submission of plans. The inclusion of Section 11(e) indicates, in addition, a Congressional intention that management should have the "initiative in suggesting from among the available alternative methods the one which it deems most appropriate" to the purpose. Matter of The United Corp., Holding Company Act Release No. 8396 (1948), CCH Federal Securities Reporter ¶ 75,954. Since the *modus operandi* of Section 11(e) provides for a unilateral plan by management, it would be in naive disregard of human instinct to assume that such plans would, in every instance, be free of the influence of dominating interests. The Commission, obviously, serves the function of Cerberus, for the applicable provisions of the Act made no allowance for a vote of approval or disapproval by the security holders.

We reiterate our view, expressed in In re Standard Gas & Electric Co., supra, at page 330 of 151 F.2d:

"We think that these proceedings under the statute are a type of reorganization and that the well known and established methods of accomplishing reorganization in a manner fair to all parties may be applied."

We have no doubt that the settlement of claims, so long as it is not accomplished in clandestine fashion, is a recognized reorganization technique. See Group of Investors v. Milwaukee R. Co., 1943, 318 U.S. 523, 565, 63 S.Ct. 727, 87 L.Ed. 959. More especially would this be true where, as already noted, we are applying a statute which not only constitutes the Commission as the exclusive initial arbiter of the statu-

---

sole trustee, to hold or administer, under the direction of the court and in accordance with the plan theretofore approved by the court and the Commission, the assets so possessed."

[6] 79 Cong.Rec., Part 13, pp. 14164, 14165:

"This differs from the Senate provision in that the Commission is to take such steps as it finds necessary to insure this result, whereas the Senate provision requires reorganization or dissolution."

tory standard, but makes no provision for a vote upon the plan by the interested parties. The plan must be fair and equitable to all interested parties, and no person is entitled to what might otherwise be fair and equitable to him standing alone if it also means that unfair treatment will result to another in the same position. The Commission, thus, would be deprived of the means of fulfilling its obligations if it were prevented from determining, as it did here, that the interest of all the common stockholders of Light & Power indicated that the complex claims be disposed of through settlement, rather than through long drawn-out, expensive litigation of which indefiniteness is an inherently detracting feature. And where the Commission makes such a determination, it devolves upon the objector to show that the result reached is outside the boundaries of the statute.

■ Moreover, the duty of the Commission under the Act rises above mere agreement or acquiescence among certain groups. Cf. Case v. Los Angeles Lumber Co., 1939, 308 U.S. 106 at pages 128, 129, 60 S.Ct. 1, 13, 84 L.Ed. 110, wherein it was stated:

"If the reorganization court were bound by such conventions of the parties, it would be effectively ousted of important duties which the Act places on it. Federal courts acting under § 77B [11 U.S.C.A. § 207] would be required to place their imprimatur on plans of reorganization which disposed of the assets of a company not in accord with the standards of "fair and equitable" but in compliance with agreements which the required percentages of security holders had previously made. Such procedure would deprive scattered and unorganized security holders of the protection which the Congress had provided them under § 77B. The scope of the duties and powers of the Court would be delimited by the bargain which reorganizers had been able to make with security holders before they asked the intercession of the court in effectuating their plan."

Thus, the presence of arm's length bargaining is not a decisive criterion, but only one of many factors to be dealt with by the Commission in reaching its conclusions. See Ladd v. Brickley, 1 Cir., 1946, 158 F.2d 212 certiorari denied 1947, 330 U.S. 819, 67 S.Ct. 675, 91 L.Ed. 1271; In re Midland United Co., D.Del., 1944, 58 F.Supp. 667, 681. The same should be true where arm's length bargaining is not an ingredient of the plan. See In the Matter of United Gas Corp., D.C.Del., 1944, 58 F.Supp. 501.[7] In either case, absent an adjudication on the merits, the fundamental task of the Commission is substantially the same.

We note the analogous responsibility of the Interstate Commerce Commission under the Interstate Commerce Act, 49 U.S.C.A. § 5:

"In determining whether each class of stockholder receives an equivalent of what it turns in, the Commission, of course, is under a duty to see that minority interests are protected, especially when there is an absence of arm's length bargaining or the terms * * * have been imposed by management interests adverse to any class of stockholders." Schwabacher v. United States, 1948, 334 U.S. 182, 201, 68 S.Ct. 958, 968.

The Securities and Exchange Commission has, in the past, evidenced appreciation for the adjustment in perspective necessitated by the absence of a negotiated settlement of contested claims, and has recognized the impact of the influence of dominating management interests in such cases. In Matter of American & Foreign Power Co., Inc., Holding Company Act Release No. 7815, CCH Federal Securities Reporter ¶ 75,835, the Commission stated:

"With respect to the suggestion that conferences between the staff and the proponents of the Amended Plan, without the participation of representatives of public security holders, make it impossible to regard the plan as a compromise resulting from arm's length bargaining by all parties concerned, it is sufficient to state that we have not so regarded the plan; on the contrary, we have considered and appraised the plan as a unilateral offer by the proponents to settle all existing legal and equitable claims in the estate. On that basis, we have given independent consideration and

---

[7] On appeal on other grounds, affirmed 3 Cir.1947, 162 F.2d 409.

made an independent determination of the fairness of the proposed plan to all persons affected." ('44-'47 CCH Decisions, p. 78, 024.)

In the instant case, as well, the Commission subjected the plan to "the most careful scrutiny", taking into consideration that it "did not have the very considerable assistance which would otherwise be derived from a settlement arrived at by parties dealing at arm's-length." Thus, it has displayed both awareness and discharge of its duty under the circumstances. This is particularly so in view of the advocacy of the procedure adopted by the Commission by the Dana Group, of which the appellants are an offshoot.

It is further urged that without dispositive findings on the merits of the claims, the Commission was not in a position to determine their value, and that they, the appellants, are not provided with a basis upon which they can assert that the settlement value as found by the Commission is not fair and equitable.

To this double-jointed argument there are several answers.

First, the Commission was not without an enabling basis for its determinations, despite the absence of arm's length bargaining. Before it were records representing several years of hearings covering all aspects of the relationship between Light & Power and North American. These records included the evidence presented with respect to the claims by adversely interested parties who did not fail to avail themselves of the opportunities afforded for the expression of their views. Accordingly, the Commission was in a particularly advantageous position to evaluate the claims, decide whether the various interests would be better served by an adjudication or settlement, and make the decisions required of it by the Act.

Second, there is a fundamental distinction between the type of findings necessary to support an adjudication and that necessary to support a conclusion of the fairness of an offer to settle. It would be anomalous, indeed, were the Commission to have, on the one hand, authority to approve a settlement, and be required, on the other hand, to go through the motions of adjudicating the very subject of the settlement. We are here in agreement with the observations of the Court in Ladd v. Brickley, supra, at page 221 of 158 F.2d:

"What was before the court? It was not the decision upon the facts or law involved in the two lawsuits. * * * It was the determination of whether or not in view of all the issues involved in those cases the settlement was for the best interests of the estate being administered under its direction."

And further:

"Certainly the court was not required to put its guess as to the probable success of each claim and defense into a formally stated conclusion."

That Court also noted that Rule 66, and not Rule 52(a), of the Federal Rules of Civil Procedure, 28 U.S.C.A., was applicable.

Once the above distinction is made, the third answer to the appellants' argument presents itself. We do not have here a "concealed compromise effected through the simple expedient of extinguishing the claim", as in Consolidated Rock Co. v. DuBois, 1941, 312 U.S. 510, 523, 61 S.Ct. 675, 684, 85 L.Ed. 982. We do have both a recognition of the existence of the claims, and all the findings that are necessary to enable the appellants to make a direct attack upon the fairness of the settlement. The Commission has determined that the settlement was for the best interests of the parties; that the amount stated in the Amended Plan is both fair and equitable. They are ultimate findings, "and represent a judgment based upon the consideration of all the imponderables involved in determining whether the proposed offer met the requirements of being fair, reasonable and adequate." Ladd v. Brickley, supra. In point of fact, the Commission has gone further, and has stated in complete form the very reasoning upon which it based its conclusions. We think that is enough.

For the reasons stated, the order of the court below will be affirmed.