In re ARKANSAS NATURAL GAS
CORP. et al.

Civ. A. No. 1498.

United States District Court
D. Delaware.

Jan. 10, 1953.

Myron S. Isaacs, Chief Counsel, Division of Public Utilities, and Frank Field, Counsel, Washington D. C., for applicant, Securities & Exchange Commission.

Frucauff, Burns, Farrell, Shanley & Johnsen and Joseph L. Weiner, New York City, Clinton J. Ruch, Eugene R. Sullivan and Everett W. Young, New York City, of counsel, for Cities Service Co.

Blanchard, Goldstein, Walker & O'Quin and Robert Roberts, Jr., Shreveport, La., H. C. Walker, Jr., Shreveport, La., of counsel, for Arkansas Natural Gas Corp.

Percival E. Jackson and Bernard S. Kanton, New York City, for Arkansas Natural Gas Corp. Class A Common Stock Committee.

Hawkins, Delafield & Wood, of New York City, Franklin S. Wood, Clarence Fried and Elliot A. Wysor, New York City, of counsel, for Public Common Stockholders Protective Committee of Arkansas Natural Gas Corp.

MARIS, Circuit Judge.

The Securities and Exchange Commission has filed an application pursuant to Sections 11(e) and 18(f) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. §§ 79k(e), 79r(f) requesting this court to approve and enforce an amended plan of Arkansas Natural Gas Corporation ("Arknat"), a registered holding company subsidiary of Cities Service Company ("Cities"), also a registered holding company, for the simplification of the corporate structure of Arknat and the termination of its status as a holding company. The amended plan was approved by findings and opinion and order of the Commission dated October 1, 1952, —— S.E.C. ——, (Holding Company Act Release No. 11511). Objections to the application have been filed by a Public Common Stockholders' Protective Committee and by a Class A Common Stock Committee. A hearing has been held after due notice and the application is now before me for determination. The facts are stated at length and in detail in the findings and opinion of the Commission. I will, therefore, refer only to those facts which relate to the objections raised by the two committees.

Arknat owns as its principal assets all of the outstanding common stocks of Arkansas Louisiana Gas Company, a gas utility company, and of Arkansas Fuel Oil Company, a non-utility company engaged in the production and transportation of crude oil, the processing of natural gas, and the marketing of petroleum products. Arknat has outstanding preferred stock, common stock, and Class A common stock, the latter being non-voting, but otherwise having the same rights in Arknat as the common stock. Cities owns about 40% of the preferred stock, about 75% of the common stock, and about 24% of the Class A common stock.

The plan proposes certain inter-corporate transactions, refinancings, and stock reclassifications; the redemption by Arknat of its preferred stock; the merger of Arkansas Fuel Oil Company into Arknat under the name of Arkansas Fuel Oil Corporation; the distribution of the common stocks of Arkansas Louisiana Gas Company and Arkansas Fuel Oil Corporation pro rata to the holders of the common and Class A stocks of Arknat; and the payment by Cities of approximately $4,070,000 cash to the public holders of Arknat's common and Class A Stocks, on the basis of 25¢ for each share of common and Class A stock and $1.25 in addition for each share of Class A Stock, in full settlement of all claims asserted or assertable against Cities, on behalf of Arknat and its security holders as such.

The objections of the Common Stockholders' Committee and of the Class A Committee attack substantially all aspects of the plan and of the findings of the Commission approving it, but are primarily concerned with the terms of the settlement of claims against Cities, particularly claims arising out of the marketing of Arknat's Class A stock in the years 1929–1930. The only two points urged by the Class A Committee at the hearing before me and the principal point raised by the Common Stockholders' Committee, concern the claims arising out of those transactions. I will, therefore, confine the present discussion to these points.

Arknat was organized on April 4, 1928, by the merger of two wholly owned subsidiaries of Cities with a third company controlled by the Benedum-Trees interests who were not affiliated with Cities. Pursuant to the merger agreement, Arknat issued preferred and common stock. Cities received 28% of the preferred stock and 60% of the common stock, and the balance was issued to the Benedum-Trees group. The merger agreement provided that all of the voting power in Arknat would be vested in the common stock, with cumulative voting for the election of directors. Throughout Arknat's existence the Benedum-Trees interests have been represented on the board of directors, and Cities has had voting control through ownership of more than a majority of the common stock.

The total amount of common stock issued pursuant to the merger agreement was approximately 4,084,000 shares, without par value. In March 1929 Arknat authorized

the issuance of 4,000,000 shares of Class A stock which, share for share, had the same rights as the common stock except that the Class A stock had no vote. In May 1929 Arknat sold approximately 1,021,000 shares of the Class A stock to holders of the common stock on a rights offering at $4 per share, at the rate of one share of Class A stock for every four shares of common stock. In connection with the rights offering, Cities purchased approximately 618,000 shares of the Class A stock. Later in that month Arknat agreed to issue to Cities on its call, for public distribution, 2,000,000 more shares of Class A stock as follows: 1,000,000 shares at not less than $5 per share; 500,000 shares at not less than $6 per share; 500,000 shares at not less than $7 per share. In September 1929, Arknat agreed to sell to Cities on its call the balance of the authorized Class A stock (approximately 979,000 shares) at not less than $15 per share. It was agreed by the parties that any proceeds over and above the minimum prices mentioned above, after deducting expenses, were to be remitted to Arknat. The basic questions raised by the objections of the committees relate to the nature and amount of the expenses properly deductible by Cities in determining the net proceeds to which Arknat was entitled, and the date as of which proceeds and expenses should have been computed.

There is no substantial dispute as to what actually occurred in the distribution. Cities took and distributed 2,500,000 shares of the Class A stock, all but approximately 479,000 of the shares which Arknat had undertaken to issue upon call by Cities. The marketing was handled by Cities through Henry L. Doherty & Co., fiscal agent for Cities. Doherty through its salesmen operating out of its offices throughout the United States offered and sold the Class A stock to customers at the closing price of the previous day on the New York Curb Exchange. Shares were sold for cash and on the installment plan; the salesmen received commissions only if the purchaser held the stock for 60 days or longer. Cities, through a subsidiary, was simultaneously trading heavily on the Curb in both the Class A stock and the common stock, with purchases vastly exceeding sales, priced and timed so as to effect a maximum inflation of the market prices on which sales of the Class A stock by Doherty & Co.'s salesmen would be based.

On June 1, 1929, the Class A and common stocks were quoted on the Curb at about 8¾. Four months later, in September 1929, the Class A stock reached a high of 24⅝ and the common stock a high of 26.

During that period Cities was taking down from Arknat the 2,500,000 shares of Class A stock referred to above, and through the Doherty salesmen was selling to the public those shares and additional shares purchased on the Curb. On September 7 1929, Cities took down the last block of 500,000 shares actually to be issued. The buying and selling by Cities through Doherty & Co. and its other subsidiary continued through the end of 1930; the number of shares traded dropped sharply after the market break in October 1929, rose sharply after January 1930, and then dropped off during the latter part of the year. By the end of 1930, when the distributing operation was terminated and an accounting had, the price was down to $5 per share.

The Commission found that the market prices paid by the purchasers of the Class A stock were artificially inflated as a result of Cities' activities, and that those activities involved fraudulent misrepresentations and omissions, and manipulation of the market. That fraud, however, was perpetrated upon the purchasers of Class A stock and not upon Arknat, which indeed received the primary benefit of the manipulative activities. Cities, of course, benefited through Arknat, as did the other common stockholders of Arknat, through the receipt by Arknat of approximately $21,500,000 for the 2,500,000 shares sold.

It is the contention of both committees that Arknat should have received more than the $21,500,000 paid to it for the 2,500,000 shares of Class A stock, and that Arknat's claim to an additional amount is so clearly established by the record and so free of any possible defense by Cities as to

make unfair the corporate settlement involved in the plan. Their argument comes down to the proposition that the record establishes a contractual obligation by Cities to Arknat to pay upwards of $13,000,000 more than was actually paid in the accounting for the marketing operations, and that there is no substantial evidence to support the Commission's finding to the contrary. In the alternative the Class A Committee contends that the record conclusively establishes that Cities was under a duty to account for the marketing operations not later than September 30, 1929, and that Cities use of December 31, 1930, even on the accounting basis employed by Cities, caused a loss to Arknat of upwards of $3,400,000. The Common Stockholders' Committee further contends that the payment of $1.25 per share by Cities to the Class A stockholders alone is unfair. Neither Committee questions the adequacy of the settlement of that claim.

■■ Before considering these contentions it should be noted that the problem presented to me is not to adjudicate the validity of the claims in controversy. The question is rather whether it was appropriate for the Commission to dispose of them through settlement under the terms of the amended plan rather than through the normal processes of litigation and, if so, whether the fairness of the settlement provided for by the amended plan is supported by substantial evidence.

There can be no doubt at this date of the propriety of disposing of claims of the kind here in controversy by settlement rather than by litigation. In re Midland United Co., D.C.Del., 1944, 58 F.Supp. 667; In re Illinois Power Co., D.C.Del., 1947, 74 F. Supp. 317, affirmed sub nom. In re North American Light & Power Co., 3 Cir., 1948, 170 F.2d 924; Ladd v. Brickley, 1 Cir., 1946, 158 F.2d 212, certiorari denied 330 U.S. 819, 67 S.Ct. 675, 91 L.Ed. 1271; In re Electric Power & Light Corp., 2 Cir., 1949, 176 F.2d 687. It is equally well established that such a settlement may properly take the form of a unilateral offer by the parent company considered and approved by the Commission, as was done

here, rather than an arm's length bargain negotiated between the parent company and representatives of the public security holders. In re Illinois Power Co., D.C. Del., 1947, 74 F.Supp. 317, affirmed sub nom. In re North American Light & Power Co., 3 Cir., 1948, 170 F.2d 924; In re American & Foreign Power Co., D.C. Me., 1948, 80 F.Supp. 514; In re Electric Power & Light Corp., 2 Cir., 1949, 176 F.2d 687. Accordingly the only question which remains for me to consider is whether there is substantial evidence in the record to support the findings of the Commission that the settlement of the claims here in question as proposed by the plan is fair. Securities & Exchange Commission v. Central-Illinois Securities Corp., 1949, 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836.

■ There is ample evidence that the agreement between Arknat and Cities with respect to the sale of the Class A stock was that Arknat would receive the minimum call prices to which I have referred and in addition the net profit, if any, realized by Cities on the entire marketing operation. The committees point to a payment of $4,000,000 made by Cities to Arknat at the end of 1929 and assert that it was to cover additional proceeds of the sale of the first 1,000,000 shares and thus establishes that Cities was obligated to pay over the proceeds of the sale of the shares without credit for expenses and losses in the marketing operation. It points to a pencil notation to that effect on an Arknat journal voucher recording the transaction. The author of this notation was not identified, however, and otherwise the transaction is consistent with the theory of a payment on account of the net proceeds to be received on the whole marketing operation. Indeed this seems to be the only admissible conclusion in view of the proven fact that substantially less than $4,000,000 of excess proceeds were actually derived from the sale of the first 1,000,000 shares of Class A stock. There is, therefore, evidentiary support for the Commission's conclusion that Cities appeared to be entitled to the approximately $13,000 000 of credits for expenses and losses in the mar-

keting operation which it claimed and was allowed in its accounting with Arknat and that the claim asserted by the committees for this sum was accordingly of very doubtful validity.

The Class A Committee has advanced in its reply brief another theory in support of this claim. It is that since the operations for the marketing of the Class A stock which Cities conducted as agent for Arknat were illegal it was not entitled in accounting to Arknat to take credit for the expenses and losses incurred by it in these illegal activities. The difficulty with this contention is that it is based upon false premises. For the Commission did not find the marketing operations to be in violation of any law then in force. It merely concluded that Cities' market manipulations involved misrepresentations as to the true value of the Class A stock which were fraudulent as to the purchasers of that stock and gave rise to a claim on their part for which $1.25 per share is to be paid them by Cities under the plan. I am in complete accord with the views expressed by the Commission in this regard, as follows:

"The claim that Cities wrongfully withheld about $13,000,000 from Arknat in connection with the accounting for the proceeds of the marketing of Arknat Class A stock has little equitable appeal. In effect it would give Arknat all the benefits of inflated prices for its original issue of stock but insulate it from any expenses incurred in the process of the alleged market manipulation producing such prices. Arknat emerged from the distributing operation with an augmentation of capital despite the deduction by Cities, as an element in the accounting, of sizeable amounts representing losses incurred as an incident to the over-all distribution of the Class A stock. The amount of $21,-448,373 finally realized by Arknat for the 2,500,000 shares, equivalent to an average price of about $8.58 per share, exceeded the take-down prices by $2,-448,373. Taking into account that the market price of the Class A stock at the beginning of the distribution was less than $8 per share, that the marketing of so large a block of stock would normally exert a depressing influence on the price which would be an element of risk in the distribution of the stock, and that substantial normal distribution expenses were to be expected in any case, the receipt by Arknat of a net average price of about $8.58 per share can hardly be regarded as injurious to that company.

"However, in our opinion the accounting was deficient in failing to credit Arknat with interest received by Cities in connection with the installment sales. Persons purchasing shares on the installment plan paid interest to Cities at the rate of 6% per annum on the unpaid balances. The record does not show the exact amount of the interest received by Cities, but the available data indicate interest payments in the neighborhood of $125,000. We think a valid claim is assertable with respect to the interest received by Cities and is entitled to recognition in assessing the fairness of the proposed settlement."

In the alternative the Class A Committee urges that Cities should have made its final accounting to Arknat on the results of the Class A stock marketing operation as of a date not later than September 30, 1929 instead of December 31, 1930, the date which was used, in which case the accounting, even on Cities' own basis, would have shown an additional sum of approximately $3,500,000 to be due to Arknat. The Commission gave some weight to this contention in determining the fairness of the amended plan. In discussing this point in its opinion the Commission said:

"A somewhat different problem is presented by the claim that the proper accounting date should have been September 30, 1929. In this connection it is important to note not only the difficulty of establishing the necessity of computing an accounting of the mar-

keting operation as of any date other than the one actually selected, but also the difficulty of establishing that Arknat suffered any substantial detriment as a result of Cities' use of December 31, 1930, as the effective date of the accounting. The evidence in the record tends to support Cities' argument that it was warranted in continuing the marketing operation beyond September 30, 1929. Also it appears that the money claims asserted as stemming from the alleged impropriety of the accounting date are greatly exaggerated. However, there appears to be some basis for the assertion of the Class A Committee that the marketing operation in behalf of Arknat had come to an end by September 30, 1929, and Cities should have rendered a final accounting by that date. Thus we note that Cities retained the interest charged on the installment sales; credited interest to Arknat's account from July 1, 1929, on the estimated profit of $4,000,000 credited to Arknat, and did not after September 30, 1929, take down the remainder of the shares under its option agreement with Arknat. An accounting as of September 30, 1929, apparently would have resulted in Arknat's receiving $20,966,191, or $482,183 less than Arknat actually received in the December 1930 accounting, plus the net proceeds of further collections by Cities of the unpaid balances on the installment contracts outstanding as of September 30, 1929, aggregating $3,962,514. The record does not show the extent of such collections. If it be assumed that the marketing operation would have terminated had the settlement been made as of September 30, 1929, it is of course conjectural whether even the amounts which were in fact collected would have been collected following the market collapse later in the year. Under all the circumstances, we think that this claim, although uncertain in amount, is entitled to some consideration in appraising the fairness of the settlement offer."

I am satisfied that these conclusions of the Commission are amply supported by the record and I am in accord with them.

■ The Common Stockholders' Committee asserts that the provision of the plan for the payment of $1.25 per share to the Class A stockholders illegally discriminates between the common and Class A stockholders and thereby renders the plan unfair. The Commission rightly concluded that this contention is without merit. The claim of the Class A stockholders against Cities is not a corporate claim asserted on behalf of Arknat. On the contrary it is a claim peculiar to the Class A stockholders as a group. It arises out of the way in which Cities manipulated the market for the purpose of unloading the Class A stock at high prices. Even though common stock was bought and sold in this operation and its price also was inflated the common stockholders as a group were not injured thereby. In the marketing operation Cities purchased considerably more common stock than it sold. Moreover the equity of the common stockholders in the assets of Arknat was actually increased by the sale of Class A stock at high prices and to that extent the common stockholders were benefited. It is not suggested that the allowance of $1.25 per share to the Class A stockholders is inadequate compensation for their claim. Its inclusion in the plan cannot, therefore, render the plan unfair.

I have given careful consideration to the other objections to the plan made by the two Committees, even though they were not actively pressed at the hearing before me, but I find them to be so lacking in merit as to require no discussion here.

In summing up its conclusions with respect to the settlement proposed by the plan to be made by Cities with the Class A and common stockholders of Arknat the Commission said:

"In reaching our conclusion that the offer of settlement produces a fair and reasonable over-all result under the circumstances of this case we have carefully weighed the merits of the various claims together with the claims for interest on such claims, the de-

fenses thereto, and the numerous contentions made with respect to them. We have found that a number of the claims have little or no merit, while others have substantial merit. It is our judgment that the proposed settlement contained in the plan falls within the range of fairness both with respect to the aggregate payment of $4,069,-268.75 to be made to the public common and Class A stockholders and the differentiation of treatment as between the two classes of security holders. The proposed payments of $1.50 per share to the Class A and 25¢ per share to the common stockholders represent compensation for the corporate claims at the rate of 25¢ per share for each class of stock or $804,055 which, translated into terms of direct recovery by Arknat as a corporation, would be equivalent to a direct payment by Cities to Arknat of approximately $1,900,000, and compensation to the Class A stock of $1.25 per share, or an aggregate of $3,265,213.75, for the special class equities of the Class A stock. Further, the formula in the plan for excluding from participation in the settlement those who, along with Cities, shared the responsibility for the organization, initial financing, and subsequent management of Arknat, is appropriate and fair and equitable.

"We conclude that the proposed settlement represents a fair compromise of the issues and may be approved under the standards of Section 11(e)."

As the result of my study of the record and for the reasons which I have stated I am fully satisfied that the findings and conclusions of the Commission are supported by substantial evidence and are in accordance with law. I, therefore, approve the plan as fair and equitable and appropriate to effectuate the provisions of the Public Utility Holding Company Act of 1935.

An appropriate order approving and enforcing the plan will be entered.