In re ENGINEERS PUBLIC SERVICE CO.

Civ. A. No. 995.

United States District Court
D. Delaware.
Nov. 30, 1953.

William H. Foulk, Wilmington, Del., for Guggenheimer & Untermeyer and

Herbert L. Cobin (Alfred Berman, New York City, of counsel).

Louis Boehm and Raymond L. Wise, New York City, pro se.

Lawrence R. Condon, New York City, pro se (Milton Maurer, New York City, of counsel).

Roger S. Foster, Gen. Counsel, Myron S. Isaacs, Chief Counsel, Division of Public Utilities, Harlow B. Lester, Sp. Counsel, Division of Public Utilities, Myer Feldman, Washington, D. C., for Securities and Exchange Commission.

LEAHY, Chief Judge.

This is an application of the Securities and Exchange Commission seeking approval and enforcement of an amended plan providing for payment of fees and disbursements incurred in connection with 'the liquidation and dissolution of Engineers Public Service Company ("Engineers") pursuant to § 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k(e). Objections have been filed to the SEC's fee proposals both by common shareholders' counsel who appeared in successful opposition to the reorganization plan before me and the Court of Appeals and subsequently unsuccessfully before the Supreme Court and by an attorney for the preferred, whose cause ultimately prevailed.[1]

This proceeding may be the forerunner of a standard operating procedure which I, at times, anticipated, but do not, in fact, look forward to with joy. From a group of statistics keepers I learn 42% or more of all § 11(e) plans submitted for District Court approval have been passed upon by me.[2] I do not desire to set another judicial record by passing upon 42% or more of all fee applications which have been and will be made to the SEC concerning these § 11(e) cases.

All I can hope for is to be able to indicate, as the cases come along, factors I think should be considered by the SEC in passing upon fee applications. Possibly, this unwanted instruction will more often take a negative form, as it has most recently,[3] but, nonetheless, I intend it to be helpful.

■ At oral argument, upon inquiry from the court, it was conceded there is no dispute as to the inherent authority of the SEC, as well as the District (enforcement) Court to allow and pay compensation and expenses to persons who have performed compensable services in connection with a § 11(e) plan under the Public Utility Holding Company Act of 1935. In the case at bar, Engineers' amended plan expressly provided all fees and expenses would be paid. Nearly $500,000 is available for such purposes. Neither Engineers nor anyone else, except the SEC, has raised question as to the right of the parties here involved to be paid the amounts they requested.[4] Dispute, however, arises as to the extent of the review power.

1. The course the plan followed may be traced by reference to In re Engineers Public Service Company, D.C.Del., 71 F. Supp. 797, affirmed in part, 3 Cir., 168 F.2d 722, and, finally, reversed, S.E.C. v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836.

2. "The outstanding example of an expert district judge is Judge Leahy of Delaware, who has reviewed 42% of all 11 (e) plans submitted for district court approval * * *. And his decisions on acceptability of plans have been highly respected by both appellate courts and the S.E.C." 59 Yale Law Journal 1365, at p. 1369.

3. In re North American Light & Power Co., D.C.Del., 101 F.Supp. 931, affirmed per curiam, 3 Cir., 202 F.2d 638; certiorari denied Securities and Exchange Commission v. Masterson, 74 S.Ct. 30.

4. It is conceded by the SEC fees allowed by them are subject to court review as a "check against possible arbitrary administrative action" (SEC brief, p. 13, n. 12). In fact, in approving the Engineers' plan this court expressly reserved jurisdiction over the SEC's fee determination and of this court's "review jurisdiction".

Under the Central-Illinois decision,[5] a district court cannot disregard a valuation finding of the SEC under § 11(e) unless such finding is not "in accordance with legal standards" or not "supported by substantial evidence".[6] This mandate of the Supreme Court must be interpreted in the light of the recent Supreme Court cases [7] admonishing reviewing courts "not to abdicate the conventional judicial function." SEC here maintains appropriate legal standards have been applied and substantial evidence adduced in disposing of the instant fee applications; objecting counsel disagree. Whatever may be the quantum of judicial prerogative here, I am convinced the duty to review embraces the power to reverse.

Background facts to the matter at bar are as follows: Management of Engineers in September, 1945, filed a plan with SEC for reorganization. This plan contemplated the elimination of preferred stockholders from the enterprise at $100 per share, the charter involuntary liquidation price. A director of Engineers (Streeter), who was also a preferred shareholder, dissented from the proposed plan, arguing it was unfair to the preferred, since it proposed to retire the preferred shares at less than their call price. The Board of Engineers at that point authorized the employment of independent counsel (Condon) to present the preferred's position to SEC and the courts. During the course of the hearings before SEC, management counsel sought to sustain the proposed plan. The view of the preferred stockholders prevailed; SEC disapproved the plan and found fairness required a payment of an amount equal to the call prices of the preferred stock. Management counsel, after studying the SEC opinion, reviewed their position and thought it was unlikely the SEC decision could be upset in the courts and, considering the expense and delay in contesting the decision, concluded the best course was to acquiesce in the SEC's determination and file an amended plan incorporating the SEC's views. Accordingly, such an amended plan was filed by Engineers in December, 1946. SEC reopened the record, issued a notice of the filing of the amendment and an order for argument and hearing to be held on January 3, 1947.

At the hearing, Alfred Berman, Esq., partner in Guggenheimer and Untermeyer (G & U), one of petitioners here, and Morton Schoor, Esq., an associate of Louis Boehm, Esq., another petitioner here, appeared on behalf of various common stockholders and filed objections to the amended plan. Berman and Schoor argued for the earlier plan provision for the payment of only $100 per share to the preferred. SEC again rejected this view and applied to this District Court for enforcement of the amended plan providing for payment of the preferred's call prices.

Then, management of Engineers, acting on advice of its counsel, took a self-styled "neutral position", more precisely one of silent assent; and, thus, common stockholders no longer had representation of their views in the courts. It was at this stage of the reorganization, G & U, representing a group of common, and Boehm and associate Wise, representing another group, took up cudgels for the common shareholders.[8]

---

5. S.E.C. v. Central-Illinois Securities Corp., supra [338 U.S. 96, 69 S.Ct. 1393], note 1.

6. Counsel made no direct attempt to differentiate the nature of the "valuation finding" of the SEC in the Central-Illinois reorganization, i.e., retirement value of preferred shares, from that in present issue, i. e., the SEC's computation of counsel fees—but quaere.

7. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 466, 95 L.Ed. 456; N. L. R. B. v. Pittsburgh Steamship Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479.

8. Herbert L. Cobin, Esq., was local counsel for G & U. Cobin's application to the SEC for $1,000 for fees and $25.79 in disbursements has been disallowed by the SEC for the same reasons as were the applications of G & U and Boehm and Wise.

As stated, G & U and Boehm and Wise were successful before me and the Court of Appeals but were unsuccessful before the Supreme Court, which upheld the view originally taken by SEC and acquiesced in by Engineers management. Condon's clients benefited from the ultimate decision. G & U, Cobin, Boehm, Wise and Condon, among others, at the conclusion of the litigation filed with SEC applications for the allowance of fees and expenses.[9] After notice and hearing, SEC disallowed all claims based on allegations of service to the estate in connection with the attempt to persuade the courts to limit payment to the preferred shareholders to only $100 per share. Compensation of $5,000 only was allowed to G & U for their services in developing an escrow agreement, and $2,500 to Boehm and Wise for their services in the investment of the funds held in escrow. Reimbursement of such expenses as were applicable to the compensable services was also ordered.[10] Condon was allowed $60,000 in fees and all claimed disbursements. In its Supplemental Application No. 2, SEC is now asking this court to approve and enforce its order on fees and disbursements over the objections of counsel whose fees and allowances were either drastically reduced from what they requested or disallowed entirely.

### Guggenheimer & Untermeyer, Cobin, Boehm and Wise

The Commission defends its disallowance action by stating: (1) "counsel for the common stockholders did not participate in the formulation of the plan or the development of the record before us, but merely contested our decision after it had been announced"; (2) efforts of counsel here "were undertaken with full knowledge that the management, in discharge of its responsibility to the common stockholders, had vigorously asserted their position before this Commission and had concluded that it was not in the interests of those stockholders to pursue it further because it considered that success was unlikely and that further contest would prove costly to the common stock." [11]

Objecting counsel do not here—nor did they before SEC—seek compensation for services in the formulation of the plan. They did not appear before SEC until after the management of Engineers had surrendered the fight for the common stockholders. Counsel for SEC at oral argument stated flatly SEC had "no criticism at all of Mr. Berman or Mr. Boehm for staying out of the proceeding while the plan was being formulated and the record made before the Commission." [12] SEC, moreover, does not criticize objecting common shareholders for coming in when they did. The stand of SEC as put to the court at oral argument is objecting common shareholders do not have the right "to require [all] common stockholders to pay for [the minority's] objections when it turns out that despite their good faith, despite their reasons for believing they were right, they were in fact wrong and the management which the common stockholders had elected was in fact right." [13] SEC does not dispute

9. G & U requested $75,000.00 in fees and $7,031.89 in disbursements; Boehm and Wise, $51,892.00 in fees and $1,220.67 in disbursements; Condon, $125,000.00 in fees and $14,680.10 in disbursements. See note 8 for Cobin's requests.

10. Cobin was not allowed anything by the SEC; see note 8.

11. HCAR 11096, March 26, 1952, "Memorandum Findings and Opinion of the Commission With Respect to Fees and 'Expenses", p. 7.

12. Oral argument, June 27, 1952, transcript, p. 17.

13. Ibid., p. 32. There is a dispute factually as to whether the Engineers management was a "common stockholder management" acting in the common stockholder interest with the implication the decision of the management to comply with the SEC plan signified agreement by common stockholders or whether the management represented all classes of security holders and its decision not to litigate was an overall judgment in the interests of all security holders. Regardless of the answer to this question, my decision here would be the same.

but for the entry of G & U, Boehm and Wise, the common stock would have been unrepresented before me.[14]

What dispute between SEC and objecting counsel here comes down to is the legal question, as posed by the G & U brief, "whether under recognized principles of reorganization law competent services rendered in representing a class of security holders in the judicial phases of a reorganization or liquidation under the Holding Company Act, with respect to issues found by the Courts to be important and meritorious, are nevertheless non-compensable if they were not ultimately successful in producing a change in the plan or a monetary enrichment of the estate."

The legal question in the context of the facts of this litigation poses the plight of counsel: petitioning counsel would have been entitled to substantial compensation for their services if the Supreme Court had denied certiorari. SEC concedes this.[15] Since the Supreme Court granted certiorari and reversed both lower courts, SEC asserts these identical services of counsel are not compensable.

1. I must under the opinion of the Supreme Court in the Engineers case review SEC's decision here to see whether SEC has followed appropriate legal standards in reaching its determination and whether SEC's conclusions are supported by substantial evidence. SEC's ratio in denying compensation and reimbursement to G & U and Boehm, Wise and Cobin is predicated on the fact they were unsuccessful in outcome of litigation.

I think SEC's decision here is at loggerheads with previously announced principles governing allowances of compensation in reorganizations under the Holding Company Act.[16] Repeatedly, SEC has emphasized vital importance of adequate security-holder participation at the expense of the estate to assure "representation of their interests and points of view" and in order "to assure adequate coverage of the issues".[17] Why

14. I am quite unable to accept the gratuitous statement of the SEC in its statement of views (Feb. 20, 1951), p. 30: "We acknowledge the important contribution which Berman's able advocacy had made to the body of law under the Holding Company Act. *Had he not appeared in District Court to challenge the fairness of the plan it is not unlikely that, in the light of the company's acquiescence, the plan would have been approved and enforced at that level.* His success in that court brought on the appeal which once and for all settled the law on authority of the Supreme Court." While it may have been a possibility, I think it far from a certainty it could be taken for granted that I would perfunctorily have entered an order of enforcement if not for the opposition of G & U.

15. Oral argument, June 27, 1952, tr. p. 121.

16. In re North American Light & Power Co., D.C., 101 F.Supp. 931, at page 933. See also Electric Bond & Share Co., H.C.A.R.No.7982; United Light and Railways Co., H.C.A.R.No.10724, and other SEC decisions therein cited.

17. "[O]nce the management has devised and filed its plan, it is natural that, as a proponent of the plan, it should exert its best efforts toward securing approval. There is thus a strong possibility that opposing groups, unless they are willing to employ separate counsel at their own expense, will not be adequately represented and that as a consequence, the thoroughness of our hearings and our ability to explore all aspects of the plan would be impaired for lack of the beneficial contribution such interested persons might otherwise make. We have been charged with responsibilities to all security holders, regardless of class, and the fulfilment of that obligation requires representation of their respective interests and points of view in proceedings before us. Unless there were some assurance that persons who contribute to development of a plan and otherwise benefit the estate will receive fair compensation, constructive suggestions would be discouraged. The payment of fees and allowances to such persons from the estate under court supervision, is an accepted principle of equity receivership and corporate reorganization law. In exercising jurisdiction over fees and expenses we have endeavored to assure adequate compensation to qualified representatives of the various groups of security holders and thereby to assure ade-

the Commission here seeks to abandon a position which protects all security-holders is not clear to me.[18] Indeed, the Commission's previous views expressed in the record would seem to constitute the law of the case for purposes of the present proceeding.

■ SEC concedes contribution to the reorganization plan need not be in the form of financial benefit. In the Engineers litigation, there is no doubt important controversial issues were raised, tenaciously fought through the courts, and ultimately determined in a manner which has clarified the administration of the Public Utility Holding Company Act. I think it unfair that those very counsel who so adroitly waged the legal battle should now be forced to come before this court to litigate the amount of their compensation.

I cannot approve a "legal standard" which would deny compensation for services such as those performed here on the ground the views advanced by these counsel were not views which finally prevailed in our court of last resort. If the questions litigated here were well settled or were obviously without merit or were pressed in bad faith, I would agree fees should not be allowed.[19] This litigation has not been a case of counsel appearing in a futile lost cause in an effort to prolong litigation.[20]

The fact is SEC's attorneys have, in another instance,[21] conceded under established principles of reorganization law, services in litigating important and unsettled issues bearing on the fairness of a plan, as to a particular class of security holders, are deemed beneficial to the reorganization process and compensable regardless of whether the contentions advanced do not ultimately prevail. In its memorandum dated June 16, 1952, to the United States District Court for the Eastern District of Virginia, in the matter of Central States Electric Corp., SEC advised the Court as follows: "As pointed out in the cases cited above, counsel for the Debtor must show a contribution to the administration of the estate and the effectuation of a plan in order to receive compensation. It is in the light of this benefit test that applicant's services must be considered. * * * As we have indicated in the case of the application of the Durrell 6% Preferred Committee, the issues posed in the plan

quate coverage of the issues before us. We think it clear that the statute confers that power and obligation." Engineers Public Service Company. H.C.A.R. No.7041, included in the present record at R. 78a–79a.

18. SEC in this very case has enunciated principles which hold for recovery here. See preceding note.

19. The SEC in its annual report to Congress for 1949 had this to say about the Engineers litigation:
"Toward the end of the fiscal year the Supreme Court sustained the Commission on major issues of law governing the consideration and enforcement of plans submitted pursuant to Section 11 (e) of the Holding Company Act. In a case posing fundamental questions concerning the Commission's valuation technique and the scope of review by the district courts which had been the subject of differing opinions within the Commission and strong attack from outside, the Supreme Court directed enforcement of a Section 11(e) plan as approved by the Commission, reversing the Court of Ap-

peals and the district court. Because of the far-reaching importance of this case it is discussed below in relation to the development of the principles adopted by the Supreme Court." Fifteenth Annual Report to Congress by the SEC, p. 122.

20. To deny compensation to counsel here would be akin to putting into effect a suggestion made several years ago in an informal talk by a now practicing attorney and former jurist, who thought Supreme Court Justices should only be paid for the time they spent in working on opinions which found them on the majority side and that all efforts spent in dissenting opinions should not be paid for since, after all, dissenting opinions are not "the law". I have always suspected this suggestion was put forth, at least in part, in earnest. The doctrine could be carried to an even more unfortunate extreme, i. e., docking wages of district court judges when reversed.

21. Central States Electric Corporation, Debtor (Proceedings for the reorganization of a corporation), No. 16620, Eastern District of Virginia.

litigation were difficult and presented novel points which required judicial determination. In having the different sides of such questions presented, briefed and argued, the reorganization process in general was furthered. Considering the nature of the issues litigated in this case, the position of applicant in the case and the able manner of presentation of their views, we believe some compensation may be awarded for these services. Since they were unsuccessful and were to some extent duplicated by the activities of the junior groups, any award should be on a modest basis."[22] In fact, in one of SEC's briefs it would appear that it has followed this principle "in its legislative recommendations to Congress, in its briefs dealing with problems under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., and in some administrative decisions under the Holding Company Act." [23]

Nevertheless, in this case SEC states it never intended, in following the enunciated principle, to "urge the abrogation of the general rule against compensating persons for non-beneficial services". It is difficult to square this latest statement with SEC's recent statement to the District Court of Virginia that "In having the different sides of such questions presented, briefed and argued, the reorganization process in general was furthered". SEC Advisory Report, Central States Electric, supra.

Unquestionably, award of compensation for services in connection with reorganizations under the Public Utility Holding Company Act of 1935 has been guided by Chapter X practices.[24]

Collier, on Bankruptcy, in speaking of compensable services under Chapter X proceedings, states:

"Activities relating to the reorganization plan are specifically provided for in § 242. Allowances may be made thereunder for services rendered and proper expenses incurred 'in connection with a plan approved by the judge, whether or not accepted by creditors and stockholders or finally confirmed by the judge.' Here again, however, no allowance will be made unless the services or costs have resulted in some 'benefit to the estate'. Nevertheless, one thing should

---

22. This is the same principle which has long been asserted in other cases, e.g., Smith v. Central Trust Co., 4 Cir., 139 F.2d 733.

The court accepted the Commission's recommendation, In re Inland Gas Corp., D.C., 73 F.Supp. 785. In its memorandum submitted to the court in that case the Commission stated: "In this sense, litigation involving such issues is of general benefit in the administration of the estate * * *. Services rendered regarding such issues, in our opinion, are no less compensable by the estate than services performed with respect to the allocation of new securities or cash in a plan of reorganization."

In the Matter of Philadelphia & Reading Coal & Iron Co., D.C., 61 F.Supp. 120, SEC recommended services of an attorney for an individual security holder should be deemed beneficial to the administration of the estate although his contentions were rejected by the courts. So, too, in Cooke v. Bowersock, 8 Cir., 122 F.2d 977, SEC took the position services of a certain committee should be held beneficial and compensable although the plan ultimately approved was over the committee's strong objection.

Likewise, in the reorganization of New York, New Haven & Hartford (See Record on Appeal, Manhattan Co. v. New York, N. H. & H. R. Co., 2 Cir., 171 F.2d 482), Judge Hincks stated:

"The reorganized debtor objected to any allowance on the petitions of the Protective Committees of Preferred and Common Stockholders. These Committees, with the aid of a 'technical adviser', and by representation through counsel, appeared in proceedings before the Commission and the Court. To be sure, their effort to develop a plan which should recognize some equity for the old stockholders proved unsuccessful. Nevertheless, lack of success in advocacy on such an issue is a factor affecting the amount rather than the propriety of compensation. I hold, therefore, that the maximum set by the Commission for services of counsel and the technical adviser to the Committees may be allowed."

23. SEC brief of July, 1952, p. 12.

24. General Gas & Electric Co., HCAR No. 8355; New England Power Ass'n., HCAR No. 8751.

be clearly understood, and that is that activities in opposition to a plan, whether they are unsuccessful or successful, may be entitled to an allowance just as well as activities in support of the plan".[25] In sum, Collier states: "The intent of the draftsmen of Chapter X seems generally to have been to authorize an allowance for creditable opposition whether successful or unsuccessful." [26] The ratio behind this position is justice and a fair interpretation of the statute demanding moderate allowances for all parties who have a proper part in any particular reorganization.

Under the authorities, I conclude benefit has been conferred upon the estate within the purview of the Act.[27] The fact is SEC has criticized the view which holds the minority which opposes a successful plan throughout is not to be compensated or given expenses because of the attempt to block the plan finally effected. SEC has stated: "These rules seem to set up a punitive ideal that had no necessary relation to the realities of reorganization * * *. Only out of the give-and-take of vigorous advocacy will each of the respective classes obtain the best possible representation in the reorganized companies".[28] SEC, furthermore, in ruling upon fee applications in other § 11(e) proceedings has granted compensation out of the estate even though the services were "ultimately un-

successful", i. e., they produced neither any increment to the estate or the security-holders nor any change in the plan as originally proposed.[29] Yet, in the instant case, where the legal issues in my opinion exceeded in importance and difficulty those involved in any of the others referred to in footnote 29, supra, which, moreover, was the only one to be reviewed by the Supreme Court and the only one to receive a favorable decision from two courts, SEC reached contrary result in holding counsel's services and necessary disbursements non-compensable. SEC has not only not attempted to distinguish these other holdings, but has not even mentioned them. The SEC is reticent.[30]

■ 2. Much has been made by SEC of the judgment of Engineers' management not to press the views which were held by the common shareholders represented by G & U and Boehm and Wise. Mere fact the "managerial judgment" was to withhold admittedly doubtful and unsettled questions from the consideration of the enforcement District Court does not seem to me to be a standard which should debar counsel here from compensation for entering the scene and advocating these complex issues before this court, the Court of Appeals, and finally to a determinative conclusion in the Supreme Court. I cannot find as a fact the then management of Engineers

25. 6 Collier on Bankruptcy, 14th ed., p. 4537, and at pp. 4507–8:
"In addition, activities which benefit the estate are not to be restricted merely to those which relate to the successful consummation of a phase, as was largely the case under § 77B. Activities relating to opposition to a plan, *either successful or unsuccessful*, are—entitled to an allowance under Chapter X. *This serves to insure the vigorous representation of all security holders and the protection of minority groups.*" (Emphasis supplied.)

26. Op. cit., supra, p. 4560.

27. I cite a comment on Chapter X since the SEC itself frequently has asserted Chapter X's applicability in awarding compensation for services in connection with reorganizations under the Holding Company Act. General Gas & Electric Co., HCAR No. 8355; New England Power Ass'n., HCAR No. 8751.

28. SEC's "Report to Congress on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees", Part VIII, p. 249.

29. Middle West Corp., HCAR No. 8697; New England Power Association, HCAR No. 8751; Midland Utilities Company, HCAR No. 8982; and Standard Gas and Electric Co., HCAR No. 8745. The latter case, with which I had some familiarity, is particularly in point.

30. The Commission's opinion is bereft of any citation to principles of reorganization law or any authorities to support its rationale and decision in this case.

constituted an omniscient body whose opinion should have been accepted as being the last word as to common shareholders' rights—especially when management reversed itself for reasons of expediency to acquiesce in the views of SEC. To have automatically agreed would have meant a serious financial loss to these common shareholders without opportunity of contesting managerial judgment in the courts. Counsel representing common shareholders should not be likened to a species of entrepreneur in salvage operations, who, as in salvage at sea, is not to receive compensation unless it rescues and delivers at dockside the derelict vessel and its cargo. This would be far cry from the principles enunciated by the Commission to the courts in the Central Trust Co. case,[31] as well as the principles enunciated and applied in its decisions relating to § 11(e) plans.[32]

Professor James William Moore of Yale is the authority on both law of federal procedure and of corporate reorganization.[33] He emphasizes particular importance of direct intervention in reorganization proceedings by stockholder representatives to guard against conflicts of interests, incompetence, and indifference on the part of management.[34] Professor Moore, with his expert competence, states: "Probably in no field of the law is intervention more important than in the field of reorganization, whether reorganization be accomplished through an equity receivership or bankruptcy proceedings * * *. To say that stockholders are represented by their directors in a reorganization is to forget that in reorganization 'the corporate structure or equity * * * becomes diaphanous, and the stockholders emerge as the real parties in interest'. It is no longer a matter of corporate business. It is a question of class against class, and a grave struggle within a class. The directors were not elected to conduct such business."

The issue, then, is not, as SEC seems to imply, whether the management acted in good faith in concluding it should swallow all doubts as to the correctness and fairness of SEC's determination and should not present the question for decision by the enforcement court. On the contrary, the issue, here, is whether decision of management[35] diminished, as the Commission has held, value and benefit to the proceedings of counsel's services, which otherwise must be held beneficial and compensable in the light of all reorganization principles, decisions and other considerations I have discussed. Management's decision to remain "neutral" was motivated by considerations of expediency and without apparent change in its previous views as to the unfairness of paying preferred stockholders a

31. 139 F.2d 733. In this case SEC attorneys appeared before the Court of Appeals and supported the position of fee applicants, urging their services were properly compensable, even though rendered in unsuccessful litigation and in urging the contentions which were rejected by unanimous decisions of the Court of Appeals and the Supreme Court. It should be noted in the Central Trust Co. case the views of the fee applicants were the same as those urged by SEC. I do not think even SEC would contend this fact should be a distinguishing factor from the case at bar.

32. See cases cited in footnote 22, supra.

33. Professor Moore is the author of Moore's Federal Practice, as well as the co-author of Moore & Oglebay on Corporate Reorganization, which is also Volume 6 of Collier on Bankruptcy (the volume dealing with corporate reorganizations).

34. 4 Moore's Federal Practice (2d Ed.), pp. 66, 73. I have had demonstrable proof of Professor Moore's views. In re Standard Gas & Electric Co., D.C., 63 F.Supp. 876.

35. Statement of Management counsel before the District Court (R. 200a):
"We are in the awkward situation of having urged on the Commission that no premium be payable, and when the Commission decided against us on the point, of *reversing our field on that* and agreeing to pay the premium; and now that the common stockholders are taking our original position which we urged, it seems to us our position should be neutral and *to leave it to them* to present that view to the Court." (Emphasis supplied.)

premium. In these circumstances, where the common stockholders were suddenly left without protection they had been led to believe they could rely on, and the wheels were set in motion to rush through the amended plan with extraordinary haste without highlighting important, doubtful issues for the consideration of the Enforcement Court, clearly counsel's services should be deemed of greater not lesser value to the proceedings, the estate and the common stockholder.

3. SEC, in opposing claim for compensation by counsel here, has relied on an assumed fact, i. e., the participation by counsel for the common resulted in a financial loss to the common shareholders. Even assuming, *arguendo*, such a test should be followed by SEC and the courts in determining compensation, I am not convinced the record before me meets the test of substantial evidence necessary to support SEC's conclusion.

I think SEC has not applied appropriate legal standards in that (1) it has not given sufficient weight to the fact counsel appeared only after everyone else had given up the fight for the common shareholders and, in so doing, counsel were raising meritorious and unsettled issues which the common shareholders had a right to have pressed in the courts; (2) SEC, in denying compensation, adopted the view management's decision not to litigate the common shareholders' views debarred the common shareholders from litigating their position themselves; (3) the Commission concluded from the record there was an expense to the estate by reason of counsel's activities here. From the record, I conclude a contrary determination could be made, i. e., activities of counsel have resulted in a net gain to the estate, and, at the least, there is serious doubt whether activities of counsel here, in fact, cost the estate anything. I do not think where there is

serious doubt the test of substantial evidence is complied with.

### Condon

■ Applicant Condon was retained by Streeter, a director and preferred shareholder, pursuant to a resolution [36] of Engineers' Board of Directors, in October, 1945, at about the time the original plan was filed with SEC. Thereafter, until the consummation of the final plan in August 1949, Condon was most active before the Commission, this court, the Court of Appeals and the Supreme Court. Principal objective for which he and others strove was achieved. Some three and a half million additional dollars were recovered by preferred shareholders as a result of the Supreme Court decision. Condon applied for a fee of $125,000 and disbursements of $14,680.10. The Commission approved a $60,000 fee and all of the requested disbursements. Condon objects proper legal standards were not followed, compensation was erroneously denied for certain "meritorious" but unsuccessful subsidiary contentions, and, by denying his corporate authorized status as counsel for the preferred, the Commission deprived him of co-equal status and compensation with management counsel.[37] SEC counters with a general proposition unsuccessful services here are not compensable and a flat denial of any attorney-client relationship between "Condon and Engineers". Further, in its argument opposing Condon, SEC explains: "The Commission's awards for the various participants were not based upon status but upon contribution. Condon was awarded compensation as a representative of bona fide security holders who assisted in the achievement of a substantial result. As a representative of security holders his efforts redounded to the benefit of the entire class of preferred stockholders as did also the serv-

36. See text of resolution, infra, note 57.

37. Mudge, Stern, Williams & Tucker represented management of Engineers during the formulation of both plans and before the Commission but withdrew from active participation in the judicial phase. SEC granted the firm's requested $120,000 fee and $1,988.69 expenses.

ices of Scheetz, the other representative of the preferred stockholders." [38]

Akin to the "legal standard" applied by SEC to the services of counsel for the common shareholders, supra, SEC, after praising Condon's contributions, says as to him:

"However, *in one respect his activities impeded consummation of the plan.* He took the position that the preferred stockholders should receive full dividends until they were paid all of the principal to which they were entitled. Accordingly, he opposed the escrow arrangement providing for immediate payment of $100 and later payment of any additional amounts to which the preferred stockholders should be held to be entitled. In this connection he applied, unsuccessfully, to three Courts for a stay of the consummation of the plan, which applications were opposed by our counsel and by all other participants. While Condon was, of course, free to take such steps as he saw fit in attempts to advance the interests of the class represented by him, in attempting to block even partial consummation of the plan *he failed to appreciate the necessity of bringing the Engineers system into compliance with the Act as expeditiously as possible.* His activities in this connection caused the expenditure of extra time by all other participants to oppose the stays and obtain consummation of the plan." [39] (Emphasis supplied.)

No charges of bad faith or frivolity are leveled at Condon for his pursuance of this subsidiary objective. On the contrary, SEC counsel expressly say, "The good faith of Condon in pressing his independent views was in no way impugned by the Commission".[40] Deliberate delaying tactics could have been understandably non-compensable, but such is not the reason for the Commission's decision here. "Impeding" and failing "to appreciate the necessity of bringing the Engineers system into compliance with the Act as expeditiously as possible" is the charge. The standard thus raised by the SEC would therefore seem to be: Let him who without success opposes even a portion of a Commission-approved plan seek compensation elsewhere. The SEC position is too stringent, in our system of unfettered advocacy, for me to accept it as a "legal standard" for this case. Even I, who had occasion to deny Condon's application for the subject stay, would not say, in final analysis, it lacked all merit or was directed as an impediment to the plan. Great sums were at stake for preferred stockholders and in the best tradition of advocacy, with the consent of the dissenting director Streeter, Condon sought nothing but full victory. True, in this, like counsel for the common in their main contentions, Condon was unsuccessful. However, ultimate success under facts of the case at bar cannot equitably be the sole prerequisite for compensation.

Undue and disproportionate stress has been placed by SEC on the extra time required "by all other participants to oppose" Condon's application for the stay. Without contradiction or comment by Commission counsel, in both briefs on this fee application and in oral argument, Condon stated the total number of days involved in his stay application through the three Courts was six, only four of which were working days and in which only fifty or so hours were consumed.[41] SEC devoted the longest of its three paragraphs of opinion on Condon's

**38.** Francis H. Scheetz, a partner in the firm of Evans, Bayard & Frick, whose principal participation was before the courts; the firm requested a fee of $50,000 and reimbursement of $2,959.65 but retreated and accepted the Commission's award of $35,000 plus all disbursements.

**39.** HCAR 11096, March 26, 1952, "Memorandum Findings and Opinion of the Commission With Respect to Fees and Expenses", p. 6.

**40.** Brief of SEC In Regard to Objections of Lawrence R. Condon, p. 15.

**41.** Transcript, March 19, 1953, p. 22; Condon's main brief, p. 96; Condon's reply brief, p. 42.

application to this "one respect" in which his activities impeded consummation of the plan. Does a six-day "delay", even if it be so, counterbalance some four years of admittedly "valuable services"? I think not. In this respect, "substantial evidence" falls short of sustaining the SEC's findings.[42]

Further look at the Commission's findings and opinion in an effort to uncover the bases for the award of only half of Condon's requested fee leads to the last of the three paragraphs devoted to this applicant. Therein, SEC notes, without dispute as to accuracy, Condon and his associates logged some 5,732 hours in the main case, exclusive of the fee hearings. SEC records its agreement with the Division of Public Utilities' doubt that "so much time could have been profitably devoted to the relevant issues in the proceedings". In the Commission's words, "we agree that the time expended appears excessive. In this connection we note that 80% of the time was spent by associates, and it appears that their work involved duplication of effort".

Are these cryptic conclusions rooted on substantial evidence? In a searching endeavor to answer, I must look beneath the Commission's findings.

Among the compensation standards, supra, which the Commission set for itself and followed, is the factor of "the time necessarily required to be expended", among those secondary to the primary factor of "benefit conferred". I

question this is any standard at all; at best, it is illusory and by definition wholly subjective. Applied here, Condon avows the time was "necessarily required" for him and his associates due to extent and duration of his representation, the complexity and novelty of the issues involved, etc. But SEC says it's of no moment how much time is "necessarily required to be expended" *by Condon*. Rather, the "standard" is either how much time SEC thinks Condon "necessarily required" or the time the Commission believes it or another group of attorneys would have required.[43] Variables are too mercurial to be captured by any such "standard". SEC admits it does not question 5732 hours were actually expended by Condon and his associates. It does question these were "necessary", with the corollary inference an unspecified number of hours were spent on "unnecessary" matters. The interpretation seems simply a restatement of SEC's contentions of unavailing and impeding action of Condon.

Whatever merit of the "time necessarily expended" standard is, as to which I have doubt, I cannot find substantial evidence to support the Commission's finding "the time expended appears excessive" or the finding, "it appears that their work involved duplication of effort". Careful use of the word "appears" in both instances reveals the Commission's awareness it is only speculating on this score. As I suggested in a prior opinion,[44] the semantics of such

42. A sidelight anomaly in the Commission's treatment of Condon's "delaying" stay application lies in the only reference in the findings to opposition to the stay, other than in the findings as to Condon himself. The Commission sees fit to include opposition to the stay application as one of the accomplishments or activities of Mudge, Stern, Williams & Tucker, the recipient of the largest fee allowed. Presumably, this activity furnished some basis, however indefinable, for the Mudge, Stern allowance. Yet, no mention of similar admitted opposition to the stay application is made in the findings of activities of counsel for the common or any other participant.

43. "Now, I might say as far as the hours in this case were concerned the Commission looked at the overall number of hours in Commission and Court proceedings and found them excessive—not excessive in terms of any questions as to whether those hours were actually spent, but only excessive in terms of the number of hours that could profitably, usefully be spent on the proceedings in relation to what the issues were and what the problems were." Counsel for the SEC in Fee Hearing Transcript, March 19, 1953, p. 66.

44. In re North American Light & Power Co., D.C.Del., 101 F.Supp. 931, 936; see note 3, supra.

loose words as "duplicative" and "unproductive" cannot be allowed to brush aside contributive worth of the varying services of the attorney. A charge of duplication without further explanation tells me nothing.[45] The "duplicative" epithet does not advance SEC's contentions.

The SEC brief suggests clarification of its finding as to Condon's time appearing "excessive". Reference is made [46] to Condon's participation in the North American Light & Power Co. case,[47] as involving "the unearthing of data and extensive development and presentation of a factual case". Indicating disparagement by way of comparison, the SEC then refers [48] to the applicant's services herein: " * * * substantially all of the work of Condon's office involved the briefing and argument of legal issues, and legal research in connection therewith. It should also be noted that the bulk of the time spent and of the briefs filed by Condon's office were devoted to the Court proceedings on the Commission's application for enforcement of the plan". I conclude from this language the Commission values factual research more highly than legal research and argument. Further, it follows the Commission undervalued, or even failed to value at all, Condon's extensive legal research, development and presentation of novel, complex, and unsettled legal issues during the judicial phase of the case.[49] This conclusion has more to support it than the Commission's silence.

Both the Commission's opinion [50] and brief [51] laud applicant Condon for playing important and leading role in the administrative proceeding, during which Condon procured and presented testimony of a financial expert "on the most controverted issue in the proceedings", later stressed by the Supreme Court's decision in upholding the amended plan. A total of 1450 hours was expended in this administrative phase of the action; and no express criticism has been leveled at this expenditure of time. Applying the yardstick SEC counsel say the Commission used, compensation computed "not upon status but upon contribution", SEC says, "Condon was awarded compensation as a representative of security holders who assisted in the achievement of a substantial result." [52] Then, the Commission was applying the above principles in similar language in its decision in Public Service Corporation of New Jersey, HCAR No. 11648. In that case, the staff of the Public Utility Division in its Recommendation, dated August 15, 1952, stated to the Commission "the rate of compensation to be accorded counsel

---

**45.** As stated in another context by Mr. Justice Frankfurter, dissenting in Federal Trade Commission v. Motion Picture Advertising Service Co., Inc., 344 U.S. 392, 73 S.Ct. 361, 366, 97 L.Ed. 426, "If judicial review is to have a basis for functioning, the Commission must do more than to pronounce a conclusion by way of fiat and without explication."

**46.** SEC brief re Condon, p. 12.

**47.** In re Illinois Power Co., D.C.Del., 74 F.Supp. 317, affirmed In re North American Light & Power Co., 3 Cir., 170 F.2d 924.

**48.** SEC brief re Condon, p. 12.

**49.** "It [i.e., the excessiveness of Condon's time] most clearly appears in the case of the phase of the proceedings in Court, *because by that time the record had all been made*. There were complicated legal issues, but that is not the same as presenting a complicated anti-

trust case. They were still legal issues to be argued in three Courts, but the legal issues were in one case coming up in three Courts, and on that phase of the case alone, the review proceedings, Condon and the employed lawyers and clerks in his office recorded the enormous number of 4,280 hours." (Emphasis supplied to interject a strong "quaere" due to the SEC's oversimplification and implication throughout minimizing the importance and complexity of the judicial phase of this case. It is also noted that the 4280 hours mentioned is the remainder of subtracting from Condon's total time, 5730 hours, the time attributed to the administrative phase, 1450 hours.) Fee Hearing Transcript re Condon, March 19, 1953, pp. 66, 67.

**50.** HCAR No. 11096, p. 6.

**51.** SEC brief re Condon, pp. 12, 13.

**52.** SEC brief re Condon, p. 11.

for public security holders who contribute in a substantial manner to a successful reorganization, may appropriately be paid at a higher rate than that of persons whose fees are not measured solely by demonstrable benefits conferred upon the estate". On such basis it recommended payment of the requested fee of $50,000 for 1236 hours, representing an hourly rate of $40 to counsel for certain preferred stockholders who made "a substantial and important contribution to the reorganization". SEC approved. Now, an application of the $40 hourly rate to Condon's 1450 hours in the administrative phase gives a sum of $58,000, just $2,000 less than Condon's award by the Commission. Can it be that $58,000 was allowed for Condon's admittedly excellent services before the Commission and $2,000 for his "one out of three wins" before the Courts? If silence be assent, the Commission would answer affirmatively, while SEC counsel is not certain.[53] In any event, no answer is forthcoming for "the Commission does not contend that it has been or can be demonstrated mathematically that the activities of Condon and his associates were worth precisely $60,000 to the reorganization proceeding."[54] I would be happy to have even a clue from the Commission as to how it arrived at Condon's award, much less a precise mathematical proof of the value of the applicant's services.

Cloak of imprecise generalities is a thin disguise for SEC determinations to avoid judicial review as being administratively final. Mr. Justice Cardozo puts a similar thought in these words: "The difficulty is that it [the Interstate Commerce Commission] has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. (Citations.) We must know what a decision means before the duty becomes ours to say whether it is right or wrong." United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 510, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023. Here, we know what the decision means, but we certainly cannot find how SEC arrived at its fee conclusions nor that substantial evidence supports them.

As to Condon's status of representation, SEC counsel deny any special position for Condon, who likens himself unto company counsel. This may explain the assertion in the SEC brief[55] that "awards for the various participants were not based upon status but upon contribution". A finding of no special status for Condon in his representation negates any award to him based on status. Likewise, none of the other fee applicants here sought special status. But does a particular "status" for an attorney entitle him to better treatment by SEC in the award of fees? The Commission apparently has so decided many times. Under the principles enunciated in the New England Power Association case, HCAR No. 8751, the North American Co. case, HCAR No. 10304, and other decisions, SEC distinguishes between a "class" representative on the one hand,

---

53. Transcript of Oral Argument before the District Court on June 25, 1952, p. 54:
"The Court: The Commission does not articulate whether they took into consideration the services of Condon in this Court, the Court of Appeals and the Supreme Court. Did they or did they not?
"Mr. Isaacs: I should assume they did. Condon's claim for services represented all his work before the Commission and the courts and the amount allowed by the Commission and deemed inadequate by Mr. Condon, purported to be full and fair compensation for all of such activities.
"The Court: Well, the Commission was silent on that phase of his services."

54. SEC brief re Condon, p. 16. Also Transcript of Oral Argument, March 19, 1953, by SEC counsel, p. 78: "Now, I don't know of any way to prove that the Commission's valuation of Mr. Condon's services at $60,000 was right or wrong or high or low."

55. SEC brief re Condon, p. 11.

and a representative of "individual clients and unorganized groups of security holders" on the other hand. The "class" representative presumably is compensated from the estate for bona fide time and effort efficiently expended, regardless of success. Indeed, an increase of benefit to the class would seem to justify a further increase in allowance. Contrarily, the representative of the individual and unorganized clients must show a "demonstrable and substantial benefit to the proceeding" or risk no compensation. SEC treatment of all the fee applicants herein under its "contribution not status" standard emphasizes its reaffirmation of the New England Power Association principles.[56] This analysis highlights importance of Condon's claim to special "class" status. If he indisputably had it, SEC would have allowed much higher compensation to him under previously announced principles. However, SEC denies any special status to Condon and admittedly ignored that factor in the award of fees. If Condon, thus, had "status" as a class representative, SEC erred by its own standards.

■ Condon's claim to "status" rests on a resolution adopted by the Engineers Board of Directors in October, 1945, set out in the footnote.[57] SEC contends [58] "that Engineers was not his client and did not agree to pay him anything" and further "It was Streeter, not Engineers,

who retained Condon." This argument tries to prove too much. To sustain his claim to "corporate authorized" status, as contrasted with a volunteer's lot, Condon need not show *Engineers* was his client. It is enough he show he was formally designated and acted as a *class* representative. This the resolution certainly does when coupled with its preamble. True, other preferred shareholders chose independent counsel, Scheetz, to represent them, but that does not detract from Condon's status. In fact, the record discloses Scheetz early disclaimed any pretensions to corporate acknowledgment of his status or corporate payment in favor of his private client.[59]

No party except SEC has contested the amount of fee Condon has requested, although the Board specifically reserved the right to do so in its resolution. Cf. Steere v. Baldwin Locomotive Works, 3 Cir., 98 F.2d 889, 892.

For all its experience in corporate reorganizations, SEC's view of Condon's "status" claim indicates naïveté. Repeated denial Condon represented "Engineers" overlooks the practical query of who constituted "Engineers" as the company underwent reorganization. The § 11(e) proceeding was the signal for the class struggle to begin over the corporate assets, as it is so often. As previously noted, supra, "the corporate structure or equity * * * becomes diapha-

---

56. See also Northern States Power Company case, HCAR 11145; Laclede Gas Light case, HCAR 7260; Columbia Gas case, HCAR 5460.

57. "Resolved that, in order to assure that the interests of the Preferred Stockholders of this Company will be represented by counsel in the proceedings before the Securities and Exchange Commission and the courts involving the Plan pursuant to Section 11(e) of the Public Utility Holding Company Act of 1935 for divestment of assets and related matters, this Board of Directors hereby authorizes the officers of this Company to reimburse the preferred stockholders of this Company for costs up to $5,000 incurred in the employment of Mr. Lawrence R. Condon, New York Attorney, who has been selected by them for such representation. Such payment to be sub-

ject to the prior approval of the Securities and Exchange Commission.

* * * * *

"* * * Provided, however, that it is understood that nothing in this resolution shall prejudice the right of Mr. Condon to apply for a larger amount or the right of the company to oppose such application; provided, further, that nothing herein shall be deemed to be an admission by the company that the Securities and Exchange Commission has jurisdiction over the payment of fees in connection with the pending Section 11 (e) plan." Applicant's Petition for Allowance, September 14, 1949.

58. SEC brief re Condon, p. 10.

59. Official Transcript of Proceedings Before SEC, November 20, 1945, pp. 109–114.

nous, and the stockholders emerge as the real parties in interest". Perhaps, failure of counsel to appreciate these practicalities in opposing Condon is a studied pose in argumentation. At least, Condon was also termed a representative of the preferred [60] when SEC opposed the fee claims of counsel for the common shareholders and evinced an awareness of the class struggle upon reorganization.

As to Condon's application, I find substantial evidence does not support SEC's findings and, in fact, the Commission erred, by its own standards, in not compensating Condon on the basis of his status as a corporate authorized representative of preferred shareholders as a class. Condon rendered constructive services before the Commission and the three Courts which have materially contributed to the formulation and accomplishment of the Engineers plan of reorganization and to the great benefit of his clients.

There remains one question: have I power to grant affirmative relief? I think I do. Counsel's services here were performed before this court and the appellate courts, as SEC itself has emphasized. Thus, this court is plainly in a position to evaluate the worth of these services just as well as the SEC.[61] I think, under the facts of this case, where counsel under this court's order of May 8, 1952, were expressly enjoined from obtaining judicial relief from any proceeding other than the present one,

counsel should be entitled to receive affirmative relief at this stage.

I reviewed the disposition made by SEC of the applications for fees made by the various counsel involved in this case and I conclude as follows:

The order of SEC relating to Guggenheimer & Untermeyer is reversed and an order authorizing the payment of $50,000 compensation and $7,031.89 reimbursement of expenses, less any amounts previously received under the SEC order, is directed to be entered forthwith.

The order of SEC relating to Louis Boehm and Raymond L. Wise is reversed and an order authorizing the payment of $35,892 compensation and $1,220.67 reimbursement of expenses, less any amounts previously received under the SEC order, is directed to be entered forthwith.

The order of SEC relating to Lawrence R. Condon is reversed and an order authorizing the payment of $75,000 compensation and $14,680.10 reimbursement of expenses, less any amounts previously received under the SEC order, is directed to be entered forthwith.

The order of SEC relating to Herbert L. Cobin is affirmed on the ground he was engaged as local counsel by Guggenheimer & Untermeyer and should look to them for any compensation or reimbursement of expenses.

An appendix is attached which shows detail of lawyers' activities.

Appropriate orders may be submitted.

60. Transcript of Oral Argument, June 25, 1952, p. 118:
"When he [Mr. Tucker] allowed Streeter to hire counsel to represent the preferred, when the company did, it was to make it clear that the majority of the Board would be absolutely free to go all out in representing the common stock before the Commission."

61. In the petition for rehearing filed by the SEC in the North American Light & Power case, D.C.Del., 101 F.Supp. 931, the Commission's attorneys argued that special latitude should be given to the

Commission's judgment in that case because most of the services of the applicant, Masterson, were performed before the Commission and not before the court. The Commission's petition stated:
"Whatever arguments there might be for according a broader scope of judicial review in appraising the worth of activities before the Court itself would only point to a corresponding latitude for the Commission's judgment with respect to activities in the administrative proceeding itself."

Appendix

(Scorecard)

A. Dissatisfied Claimants

| Name | Hours | Briefs | Appear-ances | Requested | | Awarded | |
|---|---|---|---|---|---|---|---|
| | | | | Fees | Expenses | Fees | Expenses |
| G & U | 4265 (3350 by partners; 915 by associates) | 11 | 10 in 3 Courts | $75,000 ($17 an hr.) | $7,031.89 (Nearly $5,000 for printing briefs in the 3 Courts, in 2 of which G & U were appellees) | $5,000 ($1.17 an hr.) | $703.19 |

Activities: Instrumental in amending escrow fund provision to make it operative regardless of outcome of District Court case (For this alone, Commission compensated G & U). Only counsel permitted to file a reply brief in District Court—Prepared the detailed Findings of Fact and Conclusions of law which District Court accepted and signed and which C.A. commended—Claims to be only counsel who briefed in C.A. the legislative history to which C.A. and Supreme Ct. referred extensively—Claimed to have saved estate $5,000,000 in premiums to preferred due to escrow fund above mentioned—Successful in two Courts—one of two groups of counsel representing Common shareholders.

| Name | Hours | Briefs | Appearances | Requested | | Awarded | |
|---|---|---|---|---|---|---|---|
| | | | | Fees | Expenses | Fees | Expenses |
| Boehm & Wise | 1761 | 7 | Before 3 Courts (3 appearances) (before Dist. Court on escrow) | Total: $56,038.61 a) $40,000 asked for general services to common ($22 an hr.) b) Originally asked $11,892 or 25% of net income earned from investment of escrow fund. Later asked $16,038.61, 25% of fund of $64,154.44 as of May, 1952. | $1220.67 | $2,500. ($1.41 an hr.) | Those expenses only which related to escrow fund investment. The exact amount does not appear in record. |

Activities: Almost solely instrumental in having $4,000,000 escrow fund invested, resulting in some $64,000 increase in estate; some $356,000 still invested and drawing interest. Claims but for SEC opposition, another $50,000 would have been earned from escrow fund when B & W first suggested this in May, 1947—Sought to have Commission hearing reopened and introduced expert testimony to oppose Badger's (his noncontradiction being an element in the Supreme Court's reversal)—Opposed Condon's application for stay—Had opening arguments for Common in the 3 Courts—Claims briefing of legislative history and all points G & U briefed—The second of Two Common shareholders' groups.

| Name | Hours | Briefs | Appearances | Requested | | Awarded | |
|---|---|---|---|---|---|---|---|
| | | | | Fees | Expenses | Fees | Expenses |
| Condon | 5732½ (1129 by Condon; 1668 by 2 "recognized" senior associates; 2117 by a "very experienced" senior associate; 818 by junior associates) | 13 | Before Board, Commission (1450 hrs.) and 3 Courts (4282½ hrs.) | $125,000 ($21.81 an hr.) | $14,680.10 | $60,000. ($10.47 an hr.) | $14,680.10 |

Activities: Ultimately successful cause, which added some $3,500,000 to preferred's share of assets. Presented and developed important Badger testimony on which Supreme Court and Commission relied—Successfully argued the remand idea to C.A., which it was unnecessary for the Supreme Court to decide—Participated in entire case, beginning with unsuccessful opposition to the Engineers Board re the adoption of the original plan by management—Claims much preliminary work done in Engineers files and records before Commission hearing

—Applied for stay in three Courts—Argued many subsidiary points no-one else allegedly did—A prime developer of record before Commission—One of three active groups of attorneys arguing for the same ultimate end, i. e., premiums to the preferred.

B. Satisfied Fee Recipients

| Name | Hours | Briefs | Appearances | Requested | | Awarded | |
|------|-------|--------|-------------|-----------|---|---------|---|
| | | | | Fees | Expenses | Fees | Expenses |
| Mudge, Stern, Williams & Tucker | 4,000 (60% by partners) | 1 in Dist. Ct.; 2 to SEC | Active mainly before SEC —— 1 in Dist. Ct. None in Sup. Ct. or C.A. | $120,000 ($30 an hr.) | $1,988.69 | $120,000 | $1,988.69 · |

Activities: Retained in May, 1945, to formulate Engineers Plan. Filed Plan on Sept. 10, 1945, appeared "actively" in Commission hearings, submitting "a" brief and orally arguing. Amended Plan after SEC's December 4, 1946 disapproval of original plan—Opposed Condon's stay applications—"Extensive services" re dissolution of Engineers and distribution of assets, e. g., registration of Gulf States Common stock, charter amendments, and tax problems.

| Name | Hours | Briefs | Appearances | Requested | | Awarded | |
|------|-------|--------|-------------|-----------|---|---------|---|
| | | | | Fees | Expenses | Fees | Expenses |
| Evans, Bayard & Frick | 1220 (761½ by partners) | 10 | Before Comm. largely as "observer" —— 3 Courts | $50,000 ($40.98 an hr.) | $2,959.65 | $35,000 ($28.69 an hr.) | $2,959.65 |

Activities: Participated in case from Commission stage through Courts, although admittedly as an observer, for the most part, before Commission—"Clearly and effectively presented the essential issues", according to Commission—Presented preferred's oral argument before Supreme Court—One of two counsel for preferred.

| Name | Hours | Requested and Received | |
|------|-------|------------------------|---|
| | | Fees | Expenses |
| Chase National Bank | Not specified in Commission Opinion | $5,153.37 | $408.26 |

Activities: Receipt and retention and reinvestment of escrow funds—Distribution of fund.

| Name | Hours | Requested and Received | |
|------|-------|------------------------|---|
| | | Fees | Expenses |
| Milbank, Tweed, Hope & Hadley (Chase National Bank Counsel) | Not specified in Commission Opinion | $1,705.00 | $22.92 |

Activities: None specified by Commission in its Opinion.